JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Jayant W. Tambe
Tracy V. Schaffer
Locke R. McMurray
I-Heng Hsu

*Attorneys for Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- X
                                             :

In re:                             :    Chapter 11

LEHMAN BROTHERS HOLDINGS INC., *et al.,*  :    Case No. 08-13555 (SCC)
                                     :    (Jointly Administered)

            Debtors.            :

------------------------------------------------------------- X
                                             :

MOORE MACRO FUND, LP, MOORE MACRO  :
MARKETS FUND (MASTER), LP, SJL MOORE, LTD., :    Adv. Proc. Case No. 14-02021
JR MOORE, LP, LM MOORE LP, MF MOORE LP  :    (SCC)
(formerly MOORE GLOBAL FIXED INCOME FUND :
(MASTER) LP), MOORE GLOBAL INVESTMENTS, :
LTD., MOORE EMERGING MARKETS FUND  :
(MASTER) LP, MOORE CAPITAL ADVISORS, L.L.C., :
and TRADE PROCESS CORPORATION,  :
                                             :

           Plaintiffs,           :

v.                             :

LEHMAN BROTHERS HOLDINGS INC., LEHMAN  :
BROTHERS SPECIAL FINANCING INC., and  :
LEHMAN BROTHERS COMMERCIAL  :
CORPORATION,  :
                                           :

           Defendants.         :
------------------------------------------------------------- X

**DEFENDANTS' MEMORANDUM OF LAW**
**IN OPPOSITION TO PLAINTIFFS' MOTION TO DISMISS**
<u>**DEFENDANTS' TENTH AND ELEVENTH AMENDED COUNTERCLAIMS**</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 3

     A.    The Master Agreements ............................................................................ 3

     B.    Termination of the Master Agreements .................................................. 4

     C.    Moore's Termination Amount Calculations ........................................... 5

     D.    The Assignments and Set-Offs ............................................................... 6

PROCEDURAL HISTORY ................................................................................................. 7

ARGUMENT ..................................................................................................................... 8

I.     Standard of Review for Motion to Dismiss ....................................................... 8

II.    Lehman's Eleventh Counterclaim Should Not Be Dismissed ........................... 9

     A.    The Relevant Provisions Under the Master Agreements ..................... 10

     B.    Lehman Need Not Demonstrate Damages to Collect Interest for Breach of Contract ................................................................................ 11

     C.    The Default Rate Or Alternatively The Statutory Rate Should Apply ............... 14

     D.    Moore's Status As a Defaulting Party Requires It to Pay Interest at the Default Rate ................................................................................ 15

     E.    Even if Moore's Breach of the Agreements Entitles Lehman to Interest Only At the "Applicable Rate," Moore Has Mis-Applied and Mis-Calculated That Rate ........................................................................ 16

III.   Lehman's Tenth Counterclaim Should Not Be Dismissed ............................. 17

CONCLUSION ............................................................................................................... 20

# TABLE OF AUTHORITIES

Page

CASES

*Ace Am. Ins. Co. v. Bank of the Ozarks*,
    No. 11 Civ. 3146 (PGG), 2012 U.S. Dist. LEXIS 110891 (S.D.N.Y. Aug. 6,
    2012) ...................................................................................................................8

*Belanger v. Boise Cascade Corp.*,
    968 F.2d 254 (2d Cir. 1992)..............................................................................14

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................................................................8

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002).........................................................................8, 14

*Fin. One. Pub. Co. v. Lehman Bros. Special Fin., Inc.*,
    No. 00 Civ. 6739 (CBM), 2003 U.S. Dist. LEXIS 11784 (S.D.N.Y. June 30,
    2003) .................................................................................................................17

*Graham v. James*,
    144 F.3d 229 (2d Cir. 1998)..............................................................................12

*In re Chateaugay Corp.*,
    920 F.2d 183 (2d Cir. 1990)..............................................................................18

*JPMorgan Chase Bank v. Cook*,
    318 F. Supp. 2d 159 (S.D.N.Y. 2004).................................................................8

*Love v. State*,
    78 N.Y.2d 540 (1991) .......................................................................................13

*NML Capital v. Republic of Argentina*,
    17 N.Y.3d 250 (2011) .......................................................................................12

*Ross v. Ross Metals Corp.*,
    111 A.D.3d 695 (2d Dep't 2013) ......................................................................12

*Seidman v. Indus. Recycling Properties, Inc.*,
    106 A.D.3d 983, 967 N.Y.S.2d 77 (2d Dep't 2013) .........................................12

**TABLE OF AUTHORITIES**
**(CONT'D)**

**Page**

*Spodek v. Park Prop. Dev. Assocs.,*
  96 N.Y.2d 577 (2001) ................................................................................................13

**STATUTES**

11 U.S.C. §§ 101 *et seq.*..............................................................................................2, 4

11 U.S.C. § 553(a) .........................................................................................................8

11 U.S.C. § 549(a) .........................................................................................................8

11 U.S.C. § 550 ..............................................................................................................8

**OTHER AUTHORITIES**

CPLR § 5001(a) .......................................................................................................12, 15

CPLR § 5004..............................................................................................................12, 15

Federal Rules of Bankruptcy Procedure 7012(b)............................................................1

Federal Rules of Civil Procedure 12(b)(6)................................................................1, 7

Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Special Financing Inc. ("LBSF"), and Lehman Brothers Commercial Corporation ("LBCC," and together with LBHI and LBSF, "Lehman") respectfully submit this memorandum of law in opposition to the Plaintiffs' Motion to Dismiss Defendants' Tenth and Eleventh Amended Counterclaims [Docket No. 39] (the "Motion") pursuant to Federal Rules of Civil Procedure 12(b)(6), made applicable to this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7012(b), submitted by Moore Macro Fund, LP, Moore Macro Markets Fund (Master), LP, SJL Moore, Ltd., JR Moore, LP, LM Moore LP, MF Moore LP (formerly Moore Global Fixed Income Fund (Master) LP), Moore Global Investments, LTD., Moore Emerging Markets Fund (Master) LP, Moore Capital Advisors, L.L.C., and Trade Process Corporation (collectively, "Moore," or the "Moore Entities").

## PRELIMINARY STATEMENT

Once again, Moore is requesting the Court to bless its attempt to game the ISDA Master Agreements (as further defined below, the "Master Agreements" or the "Agreements") between certain Moore Entities and Lehman. Moore has consistently sought to exploit its status as Non-defaulting Party under the Master Agreements to manipulate provisions concerning early termination and assignment to the detriment of the Lehman estate and its creditors. Moore now urges the Court to hold that Moore owes only a nominal rate of interest, unreflective of either party's cost of funding, for the $60 million in cash it impermissibly withheld from the Lehman estate for almost a year. Moore then urges the Court to turn a blind eye to Moore's own breach of the Master Agreements and hold that Lehman is not entitled to costs and attorney's fees. Granting Moore's motion would require the Court to disregard Moore's material breach of the

Master Agreements and to disregard Lehman's rights under the Agreements and at common law. For these reasons, Moore's motion must be denied.

The adversary complaint (the "Complaint") and the amended counterclaims that Lehman filed against Moore (the "Counterclaims") concern Moore's conduct upon termination of the Transactions[1] under the Agreements.  In negotiating the Agreements, the parties agreed on a series of steps to be taken upon the occurrence of an Event of Default.  That series of steps commenced on September 15, 2008, with LBHI's filing of a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").  The filing triggered an Event of Default under the Agreements, which permitted Moore, as Non-defaulting Party, to declare an Early Termination Date in respect of the Transactions.  Declaration of an Early Termination Date obligated Moore to determine the amounts payable to and from each party and to give notice of such determination (a "Valuation Statement") to Lehman of any such amount.[2]  The Agreements specifically required Moore to deliver the Valuation Statements "**on or as soon as reasonably practicable after the occurrence of the Early Termination Date**."

Moore's position in this adversary proceeding, in which it requests the Court to approve the assignments and set-offs among the Moore Entities, is flatly at odds that with its implicit position under the Motion that it had not completed calculation of the amounts due and owing under the Agreements by October 3, 2008.  Simply put, Moore could not have effected the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Master Agreements

[2] There are additional factual disputes concerning whether Moore produced artificially low calculations of amounts owing to Lehman by certain of the Moore Entities and inflated claims against Lehman by other of the Moore Entities.  Moore has not moved to dismiss those causes of action.

assignments and set-offs without first calculating the amounts each Moore Entity either owed to or was due from Lehman.

Even though Moore's purported position on the assignments and set-offs requires it to have known how much it owed Lehman by October 3, 2008, and despite the fact that Moore had accumulated all of the market and other data needed for it to determine the Termination Amounts by no later than September 16, 2008, Moore delayed delivery of the Valuation Statements for nine or more months. During that time, Moore deprived Lehman of nearly $60 million in cash it was owed under the pretext that it had not effected delivery of the Valuation Statements. This undue delay breached Moore's obligation under the Master Agreements to deliver the Valuation Statements "as soon as reasonably practicable" and deprived the Lehman estate of its property. Lehman is entitled to interest at the Default Rate from when the Valuation Statements should have been delivered to when Moore actually made the payment. Furthermore, Moore's breach of its obligations under the Master Agreements entitles Lehman to recover its attorney's fees. Moore's Motion must be denied.

## FACTUAL BACKGROUND

### A.    The Master Agreements

Lehman and the Moore Entities entered into a series of ISDA Master Agreements in July 2008. Specifically, LBSF entered into ISDA Master Agreements dated as of July 23, 2008 with Moore Macro Fund, LP ("Moore Macro"), Moore Macro Markets Fund (Master), LP ("Macro Markets"), SJL Moore, Ltd ("SJL"), JR Moore, LP ("JR"), LM Moore LP ("LM"), and MF Moore LP (formerly Moore Global Fixed Income Fund (Master) LP) ("MF") (collectively, the

"LBSF Master Agreements")[3] and LBCC and Moore Macro entered into an ISDA Master

Agreement dated as of July 24, 2008 (together with an ISDA Master Agreement dated as of

October 15, 1998 (the "TradePro Master Agreement") between LBCC and Trade Process

Corporation, the "LBCC Master Agreements," and together with the LBSF Master Agreements,

the "Agreements" or the "Master Agreements").  Amended Counterclaims ¶¶ 19-26.  LBHI

guaranteed the obligations of LBSF and LBCC under the Master Agreements.  *Id*.

### B.  Termination of the Master Agreements

Shortly before 2:00 a.m. (New York time) on September 15, 2008, LBHI filed a

voluntary petition for relief in this court (the "Bankruptcy Court") under Chapter 11 of the

Bankruptcy Code (the "LBHI Filing").  LBSF and LBCC followed suit and filed voluntary

petitions for relief in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code on October

3 and October 5, 2008, respectively (the "LBSF Filing" and the "LBCC Filing," respectively).

*Id.* ¶ 28.  As of the LBHI Filing, there remained unexpired Transactions and outstanding

ancillary payment and delivery obligations under each of the Master Agreements.  *Id.* ¶ 29.  Due

to LBHI's status as Credit Support Provider for LBSF and LBCC, the LBHI Filing constituted an

Event of Default under each of the Master Agreements.  *Id.* ¶ 30.  Moore alleges that it delivered

termination notices (the "Termination Notices") to LBCC and LBSF on September 15, 2008 and

declared September 15, 2008 to be the Early Termination Date under each of the Master

Agreements.  *Id.* ¶ 31.

---

[3] Moore Macro, Macro Markets, SJL, JR, LM, and MF each executed  the same physical ISDA Master
Agreement, but that ISDA Master Agreement represented separate agreements between LBSF and each applicable
Moore Entities, jointly and not severally, and LBSF.

### C.   Moore's Termination Amount Calculations

The occurrence of an Early Termination Date under each of the Master Agreements terminated the Transactions thereunder, at which point in time each Transaction had a value (the "Mark-to-Market Value") in favor of or against each party to the Master Agreement.  *Id.* ¶ 32. These values, for and against each party, were to have been summed (or "netted") to derive a net market value (the "Agreement Mark-to-Market Value") for the portfolio of Transactions under each Master Agreement in favor of one or the other of the parties.  *Id.*  This Agreement Mark-to-Market Value, plus or minus collateral and miscellaneous payments then due under the Transactions but not yet paid (the "Termination Amount") became payable to the party with the net amount owing to it.  *Id.*

Having declared the Early Termination Date, Moore incurred the obligation to determine the Termination Amount under each Agreement and to deliver a Valuation Statement to Lehman "[o]n or as soon as reasonably practicable following the occurrence of an Early Termination Date."  *Id.* ¶ 35. [4]  Pursuant to this obligation, Moore collected the market quotations and other data from which it calculated the Termination Amount on the day of and immediately following the Early Termination Date.  Moore thus had in hand all determinants of value for the Transactions by September 16.  Moore Macro and Macro Markets nevertheless did not effect delivery of their Valuation Statement to LBSF until June 2, 2009 and August 25, 2009, respectively, and Trade Process Corporation did not effect delivery of its Valuation Statement to LBCC until July 22, 2009.  Plaintiffs' Memorandum of Law in Support of the Motion ("Pl. Memo."), at 5.

---

[4]  Lehman disputes Moore's determination of the Termination Amounts   The Motion does not implicate Lehman's challenges to Moore's determination of Termination Amounts relating to these disputed Transactions.

D.    **The Assignments and Set-Offs**

Since the filing of its initial Complaint [Docket No. 1], Moore has resolutely maintained that it assigned and transferred claims between the various Moore Entities and exercised rights of set-off (the "Assignments and Set-Offs") prior to the LBSF Filing "effective" October 3, 2008.[5] Notwithstanding that the Assignments and Set-Offs – whether or not they occurred prior to the LBSF Filing – were impermissible both under the Agreements and under the Bankruptcy Code, the date on which Moore maintains they were effectuated bears significance, because determination of how much to assign, transfer and set-off under each Agreement requires Moore to have calculated the amounts due and owing under each Agreement.  The assertion that the Assignments and Set-Offs were complete by October 3 thus precludes Moore from claiming not to have had knowledge of the Termination Amounts as of that early date, and accordingly effectively represents an admission by Moore that its delay in delivering the Valuation Statements breached the Agreements.

Despite its alleged knowledge of the Termination Amounts – attested by Moore's own request to this Court to bless the assignments – Moore delayed nearly nine months (and in some cases ten or eleven) before delivering Valuation Statements to Lehman.  This delay was impermissible under the Agreements.  The Agreements require that Valuation Statements be delivered "[o]n or as soon as reasonably practicable following the occurrence of an Early Termination Date."  *Id* at ¶ 35.  Moore's unreasonable delay, which occurred solely for the

---

[5] The Assignments and Set-Offs have been more fully described by both parties in prior pleadings.  *See* Complaint [Docket No. 1] at ¶¶ 39-42.  *See also* Amended Answer and Counterclaims [Docket No. 31] at Counterclaims ¶¶45-52 and Moore's prior Motion to Dismiss Defendants' First, Fifth, Sixth and Seventh Counterclaims [Docket No. 15] and associated briefing at Docket Nos. 19 and 23.

purpose of depriving the Lehman estate of a valuable asset for as long as Moore could hold out, put it in breach of the Agreements.

## PROCEDURAL HISTORY

Moore commenced this adversary proceeding on May 30, 2014 in the Bankruptcy Court seeking (1) a declaratory judgment that Moore's calculations of the amounts parties owed to each other are valid; and (2) a declaratory judgment that Moore's assignments of amounts owed to certain Moore Entities under the Master Agreements were properly used to offset amounts owed by other Moore Entities to LBSF. On July 3, 2014, Lehman filed its Answers and Counterclaims on July 3, 2014 challenging the Assignments and Set-Offs as breaches of the LBSF Master Agreements in addition to being void or voidable under the Bankruptcy Code. Lehman also challenged Moore's valuation of the Master Agreements, made certain claims for affirmative recoveries, and objected to the proofs of claim (the "Proofs of Claim") filed by Moore.[6]

On September 5, 2014, Moore moved to dismiss Lehman's First, Fifth, Sixth and Seventh Counterclaims, which motion was fully briefed and argued before the Court on January 16, 2015. On December 23, 2014, Moore and Lehman jointly filed a stipulation [Docket No. 30] to allow Lehman file the Amended Answer and Counterclaims, which were filed by Lehman on December 24, 2014. Moore filed the present Motion on February 9, 2014, seeking to dismiss Lehman's Eleventh Counterclaim for interest at the Default Rate and Lehman's Tenth Counterclaim for attorney's fees. Moore has not sought to dismiss Lehman's Second, Third, and Fourth Counterclaims, which seek to unwind the Assignments and Set-Offs in the event the

---

[6] On July 3, 2014, Moore moved to withdraw the reference to Bankruptcy Court. The motion was briefed and argued before Judge William H. Pauley III of the United States District Court for the Southern District of New York and was denied without prejudice on September 5, 2014.

Assignments are determined to have taken place after the commencement of LBSF's bankruptcy

case pursuant to Sections 553(a), 549(a), and 550 of the Bankruptcy Code, respectively.  Moore

also does not seek to dismiss Lehman's Eighth Counterclaim, which alleges breach of contract

based on Moore's failure to determine the Termination Amounts in accordance with the Master

Agreements, or Lehman's Ninth Counterclaim, which objects to the Proofs of Claim.

## ARGUMENT

### I.    STANDARD OF REVIEW FOR MOTION TO DISMISS

A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face'" to survive a motion to dismiss.  *Ace Am. Ins. Co. v. Bank of

the Ozarks*, No. 11 Civ. 3146 (PGG), 2012 U.S. Dist. LEXIS 110891, at *5 (S.D.N.Y. Aug. 6,

2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted)).[7]  On a Rule

12(b)(6) motion to dismiss, a complaint "does not need detailed factual allegations" and shall not

be dismissed as long as the factual allegations are "enough to raise a right to relief above the

speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In deciding a motion to dismiss, the court must "constru[e] the complaint liberally,

accepting all factual allegations in the complaint as true, and draw[] all reasonable inferences in

the plaintiff's favor."  *Chambers*, 282 F.3d at 152.  Accordingly, "[d]ismissal is inappropriate

unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle

him or her to relief."  *Id.* at 152 (internal quotation marks and citation omitted); *see JPMorgan

Chase Bank*, 318 F. Supp. 2d at 164 (same).

---

[7] Additionally, "[b]eyond the facts in the complaint, the Court may consider 'any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'"  *JPMorgan Chase Bank v. Cook*, 318 F. Supp. 2d 159, 164 (S.D.N.Y. 2004) (citation omitted); *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (same).

Here, a dispute exists between the parties regarding Moore's actions with respect to the

Termination Amounts due Lehman under the Master Agreements after Moore declared an Early

Termination Date.  Lehman has adequately pleaded that Moore breached its obligation to deliver

Valuation Statements "on or as soon as reasonably practicable following" the Early Termination

Date.  By claiming that the Assignments and Set-Offs had taken place prior to the LBSF Filing,

Moore cannot maintain that it was not in a position to deliver Valuation Statements as of October

3, 2008.  Although Moore's Valuation Statements make it abundantly clear that Moore had

obtained all market and other data necessary to determine the termination Amounts by Septmebr

16, 2008, Moore did not begin to deliver Valuation Statements until June 2009, or more than

eight months after it was "reasonably practicable" for it to do so.  Therefore, Moore breached its

obligations under the Master Agreements and caused damage to the Lehman estate by

withholding the estate's property for over eight months without justification.

## II.    LEHMAN'S ELEVENTH COUNTERCLAIM SHOULD NOT BE DISMISSED

Moore attempts to use the fact that it was not the Defaulting Party to shield itself from its

obligations under the Master Agreements, including the requirement that the Non-defaulting

Party deliver the Valuation Statements "[o]n or as soon as reasonably practicable following the

occurrence of an Early Termination Date."  Master Agreement, Section 6(d)(ii).  In other words,

Moore asks this Court to adopt the position that, solely because Moore was not a Defaulting

Party under the Master Agreements, it was free to withhold payment to Lehman by indefinitely

delaying delivery of the Valuation Statements, which in the ordinary course would have

triggered its obligation to pay the Termination Amounts.  Such a result is an absurd interpretation

of the parties' rights and duties under the Master Agreements and demonstrates why Lehman's

Eleventh Counterclaim must not be dismissed.  Moreover, as acknowledged by Moore in the

Valuation Statements but denied in the Motion, Lehman provided repeated notice to Moore of its

failure to effect timely delivery of the Valuation Statements, which failure Moore did not cure within any cure period set forth in the Master Agreements.  Moore accordingly became a Defaulting Party for purposes of the interest rate provisions of the Master Agreements.

## A.    <u>The Relevant Provisions Under the Master Agreements</u>

Under the Master Agreements:

An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event).  Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

Master Agreement, Section 6(d)(ii).  Under Section 6(d)(i) of the Master Agreements:

On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (I) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) . . . .

Furthermore, under the Master Agreements, "Applicable Rate" is defined as:

(a) in respect of Obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b) in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c) in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d) in all other cases, the Termination Rate.

Master Agreement, Section 14.  The Default Rate is in turn defined as "a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum;" the Non-default Rate as "a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount" and the Termination Rate as "a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts."  *Id.*

The question of interest rates gives rise to two separate disputes under the Agreements: one concerning the calculation of "Applicable Rate" and one concerning the consequences of Moore's breach of contract on the rights and obligations of the parties.  In the normal course, interest on Termination Amounts accrues at the appropriate Applicable Rate until delivery of the Valuation Statements.  In this case, the parties disagree over whether the Applicable Rate is the Termination Rate or the Non-default Rate.  In the normal course, however, Valuation Statements are delivered "on or as soon as reasonably practicable after" the declaration of an Early Termination Date.  Moore's nearly nine-month delay from the time it calculated the termination payments to the time it delivered the Valuation Statements marks a significant departure from the normal course.  Moore simply disregards these factual allegations in its Motion to Dismiss.

### B.    Lehman Need Not Demonstrate Damages to Collect Interest for Breach of Contract

Moore argues that Lehman's Eleventh Counterclaim must be dismissed for failure to plead damages.  Pl. Memo., at 16-17.  Moore argues that under New York law, "the theory underlying damages for breach of contract is to make good or replace the loss caused by the breach.  Damages are intended to return the parties to the point at which the breach arose and to

place the non-breaching party in as good a position as it would have been had the contract been

performed." *Seidman v. Indus. Recycling Properties, Inc.*, 106 A.D.3d 983, 985, 967 N.Y.S.2d

77, 79 (2d Dep't 2013).

Moore misstates the law. Lehman is entitled to interest at the appropriate rate (be it the

Default Rate, the Termination Rate or some other rate) without proof of damages. Under New

York law "prejudgment interest is normally recoverable as a matter of right in an action at law

for breach of contract." *Graham v. James*, 144 F.3d 229, 239 (2d Cir. 1998). Where a contract

specifies a rate of interest (whether a "default" or some other rate), that interest rate prevails and

where a contract is silent, the statutory rate prevails. *See NML Capital v. Republic of Argentina*,

17 N.Y.3d 250, 258 (2011) (stating that where a claim is "predicated on a breach of contract, the

applicable rate of prejudgment interest varies depending on the nature and terms of the contract.

[Where a contract rate is provided, it] is used to calculate interest on principal prior to loan

maturity or a default in performance. If the parties failed to include a provision in the contract

addressing the interest rate that governs after principal is due or in the event of a breach, New

York's statutory rate will be applied as the default rate"); *see also Ross v. Ross Metals Corp.*,

111 A.D.3d 695, 697 (2d Dep't 2013) (stating that "[t]he contract rate of interest will be 'used to

calculate interest on . . . a default in performance,' and in the absence of 'a provision in the

contract addressing the interest rate . . . New York's statutory rate will be applied as the default

rate.'") The New York statute governing interest is CPLR § 5001(a), which dictates that

"[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a

contract, or because of an act or omission depriving or otherwise interfering with title to, or

possession or enjoyment of, property." CPLR § 5001(a). New York awards a statutory rate of

9% under CPLR § 5004.

The principle underlying an award of interest is one of compensation.  Interest becomes due in a breach of contract case because the breaching party to a contract deprives the non-breaching party of a valuable asset "from the accrual of the cause of action . . . to the date liability was fixed."  *Spodek v. Park Prop. Dev. Assocs.*, 96 N.Y.2d 577, 579 (2001).  In *Spodek*, the New York Court of Appeals quotes Chief Judge Cardozo to explain this principle:  "While the dispute as to value was going on, the defendant had the benefit of the money, and the plaintiff was without it.  Interest must be added if we are to make the plaintiff whole. … If [defendant] chose to keep the money, it should pay for what it kept. There would be obvious injustice if interest were to be lost as the result of a slight discrepancy between the claim and the award."  Id. at 581.  The Court of Appeals periodically reaffirms and expands on this compensatory principle.  For instance, in *Love v. State*, the Court held that ". . .it is worthy of note that the defendant, who has actually had the use of the money, has presumably used the money to its benefit and, consequently, has realized some profit, tangible or otherwise, from having it in hand during the pendency of the litigation.  There is thus nothing unfair about requiring the defendant to pay over this 'profit' in the form of interest to the plaintiff, the party who was entitled to the funds from the date the defendant's liability was fixed.  Indeed, inasmuch as the defendant was not entitled to the use of the money from the moment that liability was established, a rule that would permit the defendant to retain the cost of using the money (i.e., interest) would provide the defendant with a windfall."  *Love v. State*, 78 N.Y.2d 540, 545 (1991).

Lehman has sufficiently pleaded that Moore's undue delays in delivering the Valuation Statements constitute a breach of the Master Agreements.  As Moore concedes in the Valuation Statements, Lehman had sent Moore multiple letters regarding Moore's delay in providing the Valuation Statements and advised Moore that interest would apply.  *See* McMurray Decl. Exs. A

at Para. 6(ii), B at Para. 7(ii) and C at Para. 3(ii) (Moore's acknowledgement of receiving these letters) and Ex. D (a sampling of these letters). However, instead of turning over the estate's property to Lehman as soon as reasonably practicable, Moore continued to hold on to nearly $60 million until June 2009. Accordingly, Lehman's Eleventh Counterclaim should not be dismissed.

### C.    The Default Rate Or Alternatively The Statutory Rate Should Apply

Moore contends that the Default Rate should not apply because the Moore Entities were not the Defaulting Parties under the Master Agreements. However, for purposes of the Motion, the Court must assume that Moore breached the Master Agreement: on a motion to dismiss, the court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Chambers*, 282 F.3d at 152. Lehman has sufficiently alleged that Moore had failed to deliver the Valuation Statements and make payments to Lehman in a timely manner, thereby breaching the contract.

The time-honored remedy for breach of contract is to award damages that are intended to restore the aggrieved party to the same economic position it would have enjoyed had the contract been performed. *See Belanger v. Boise Cascade Corp.*, 968 F.2d 254, 258 (2d Cir. 1992) (citing J. Calamari & J. Perillo, Contracts § 14-4 (3d ed. 1987)). This remedy requires payment of interest at the Default Rate because, as Chief Judge Cardozo put it, "[i]nterest must be added if we are to make the plaintiff whole. … If [defendant] chose to keep the money, it should pay for what it kept." *Spodek* at 581.

The Moore Entities breached the Master Agreements by failing to deliver Valuation Statements when it became reasonably practicable for them to be delivered. Interest should accordingly have accrued at the Default Rate commencing on the date that Moore should have delivered the Valuation Statements. The Default Rate must be awarded in order to restore

Lehman to the same economic position it would have enjoyed had the contract been performed.

However, even if Moore is correct that the Agreements preclude application of the Default Rate

from and after Moore's breach, the inescapable conclusion is that statutory interest must be

assessed under CPLR § 5001(a).  That rate, of course, is 9%.  CPLR § 5004.

> ### D. Moore's Status As a Defaulting Party Requires It to Pay Interest at the Default Rate

Moore expends considerable efforts in its Motion to demonstrate how and why the Non-

defaulting Party is never responsible for interest at the Default Rate, unless perhaps on and after

effective delivery of the Valuation Statement.  However, Moore has also repeatedly

acknowledged the receipt of multiple letters from Lehman (the "Notices") concerning the

delayed delivery of the Valuation Statements and the interest rate that would accordingly be

applicable.  *See* McMurray Decl. Exs. A to D.  The Notices, which were sent in February 2009,

specifically warned Moore that "we have yet to receive your statement (the "Valuation

Statement") under Section 6(d)(i) of the Master Agreement. . .which is required to be delivered

'[o]n or as soon as reasonably practicable following the occurrence of an Early Termination

Date.'"  *Id.*, at Ex. D.  Lehman further put Moore on notice that Lehman "reserves the right to

apply the Default Rate (which is Lehman's cost of funding plus 1%) to amounts owing to

Lehman from and after a date prior to the effective date of the Valuation Statement if it

transpires that the Valuation Statement is not delivered in a timely fashion in accordance with

Section 6(d)(i)."  *Id*.

As Moore itself recites, Pl. Memo at 14, the Agreements provided that an Event of

Default will occur upon "Failure by a party to comply with or perform any agreement or

obligation . . . to be complied with or performed by the party in accordance with this Agreement

if such failure is not remedied on or before the thirtieth day after notice of such failure is given to

the party. . ." Master Agreements, Section 5(a)(ii). The occurrence of an Event of Default "with

respect to a party" renders that party a "Defaulting Party." *Id.*, at § 6(a). Moore has articulated

no reason why the Notices would not have triggered an Event of Default, after the appropriate

cure period, with *Moore* as the Defaulting Party. The fact that Lehman did not exercise a Non-

defaulting Party's standard right to declare an Early Termination Date is of no moment, since

Moore had of course already done so. Lehman is, however, now exercising its rights to collect

interest under clause "(a)" of the definition of "Applicable Rate," which applies the Default Rate

to obligations payable or deliverable by a Defaulting Party.

### E.    Even if Moore's Breach of the Agreements Entitles Lehman to Interest Only At the "Applicable Rate," Moore Has Mis-Applied and Mis-Calculated That Rate

Both legal and factual disputes surrounding the Applicable Rate of interest underpin

Lehman's request for relief and negate Moore's Motion. Lehman has alleged facts justifying

selection of the Default Rate or the statutory rate as the appropriate rate of interest.  By contrast,

Moore's calculations of interest, at 0.23% and 0.21% for the LBSF Master Agreements and the

TradePro Master Agreements, respectively, understate the Applicable Rate. Moore asserts the

propriety of these rates because they represent "the Non-default Rate . . . being the rate per

annum equal to the cost (without proof or evidence of any actual cost) to us if were to fund the

relevant amount." *See* McMurray Decl. Exs. A at Para. 6(i), B at Para. 7(i) and C at Para. 3(i).

As noted above in Part II.A, Lehman contests the factual and legal predicates justifying Moore's

choice of interest rate. Indeed, Lehman asserts that the correct interest rate is the Termination

Rate, which is the arithmetic mean of Moore's and Lehman's costs of funding. Lehman's cost of

funding for purposes of deriving the Termination Rate has not been established and is a question

of fact that cannot form the predicate for a motion to dismiss.

Moreover, even were the Non-default Rate to apply, Moore still understated it.  In the

Valuation Statements, Moore represented its cost of funding at 0.23% and 0.21%.  However, its

own quotations raise questions regarding the accuracy of these figures.  Although the Master

Agreements may seek under ordinary circumstances to preclude an issue of fact with regard to

the correct Non-default Rate with the phrases "without proof or evidence of any actual cost" and

"as certified by [the Non-defaulting Party]," this preclusion will not be enforced when there is

"bad faith, fraud, gross negligence or contravention of public policy."  *See Fin. One. Pub. Co. v.*

*Lehman Bros. Special Fin., Inc.*, No. 00 Civ. 6739 (CBM), 2003 U.S. Dist. LEXIS 11784, at *6

(S.D.N.Y. June 30, 2003).  The discrepancy between the cost of funding ascribed to Moore in

certain of the Market Quotations it received in relation to the very Master Agreements at issue in

this litigation and the alleged cost of funding reflected in the Valuation Statements is suggestive

of manifest error and, at a minimum, gross negligence on the part of Moore and raises a question

of fact regarding Moore's actual cost of funding that cannot form the predicate of a motion to

dismiss.

## III.   LEHMAN'S TENTH COUNTERCLAIM SHOULD NOT BE DISMISSED

Despite Moore's wishes to the contrary, Lehman is entitled to reasonable attorney's fees

because, by breaching the Master Agreements, Moore became a Defaulting Party.  Even if

Moore were not a Defaulting Party, though, Lehman would still be entitled to attorney's fees.

The crabbed reading of the Master Agreements that Moore urges on the Court fails to read the

contract as a whole.  Indeed, if Moore's interpretation were accepted, it would lead to

unconscionable results whenever the Defaulting Party was owed money under an ISDA Master

Agreement.

Moore contends that Paragraph 11 of the Master Agreements requires only a Defaulting

Party to indemnify the other party for legal fees and costs of collection.  However, Moore

misreads the Agreements in asserting that they do not entitle Lehman to attorney's fees.  First,

Moore became a Defaulting Party by its breach of the Agreements as set forth in Part II.D above.

Second, even if Moore were not a Defaulting Party, a careful reading of the language in Section

11 and its relationship to the "Loss" definition makes clear that the attorney's fees for a

Defaulting Party are included within the definition of Loss.  Finally, an interpretation of the

Agreements that denied attorney's fees to the Defaulting Party would reach an unconscionable

conclusion that would enable a Non-defaulting Party to require the Defaulting Party to sue for

collection of a termination payment at its own expense, while the Non-defaulting Party would be

indemnified for exactly the same action.

As established in Part II.D above, Moore's breach of the Agreements rendered it a

Defaulting Party for purposes of accruing interest on amounts owed at the Default Rate.  That

conclusion applies *a fortiori* to the indemnification for attorney's fees under Section 11 of the

Master Agreements, since Moore has failed to this day to pay an appropriate amount of interest

and Lehman is continuing to this day to incur attorney's fees to collect that interest as well as

other amounts Moore owes Lehman in consequence of its breaches of the Master Agreements

and violations of the Bankruptcy Code.[8]

Even if Moore is not a Defaulting Party, the definition of Loss, read in conjunction with

Section 11, requires Moore to indemnify Lehman for its attorney's fees.  The operative sentence

in the definition of Loss is the following: "Loss does not include a party's legal fees and out-of-

pocket expenses referred to under Section 11."  Section 11, in turn, reads, "A Defaulting Party

---

[8] Although not at issue in the Motion, Lehman's Sixth Counterclaim is for breach of the automatic stay and
for "sanctions of a nature and/or in an amount as determined by the Court."  Attorney's fees are routinely awarded
for breach of the automatic stay.  *See, e.g., In re Chateaugay Corp.*, 920 F.2d 183, 186-87 (2d Cir. 1990) and cases
cited therein.

will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and stamp tax . . . ." These two clauses interact in a very specific way. The definition of Loss carves out those expenses mentioned in Section 11, i.e., the Non-Defaulting Party's legal fees. This ensures that the Non-defaulting Party does not receive a "double-dip" recovery of its legal fees. By its terms, however, Section 11 does not mention the Defaulting Party's legal fees, and the Defaulting Party's legal fees remain available to be recovered under the definition of Loss.

Treating Moore as a Defaulting Party for purposes of Section 11 or permitting the Defaulting Party to recover attorney's fees under the definition of Loss in the case at bar makes sense, as any other reading would transform a latent imbalance into a manifest unfairness. The Agreements make room for Termination Amounts to be paid in either direction (either to or from the Defaulting Party) depending on which party is "in the money." If the Agreements were to be read to exclude recovery of attorney's fees by a Defaulting Party in those cases where it is "in the money," this neutrality would be eliminated and the Agreements would penalize one party over another. Specifically, they would allow a Non-defaulting Party to recover legal costs that, apparently, could not be recovered by a Defaulting Party. Such a conclusion, however, is patently unconscionable, as it would permit a Non-defaulting Party to force the Defaulting Party to sue to collect a Termination Amount at its own expense. For this reason, Lehman is entitled to reasonable attorney's fees, and its Tenth Counterclaim should not be dismissed.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Lehman respectfully requests the Court to deny the Motion

with prejudice.


Dated: March 16, 2015                       JONES DAY
      New York, New York


    /s/ Locke R. McMurray
    Jayant W. Tambe
    Tracy V. Schaffer
    Locke R. McMurray
    I-Heng Hsu
    222 East 41st Street
    New York, New York  10017
    Telephone:  (212) 326-3939
    Facsimile:  (212) 755-7306

    *Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I, I-Heng Hsu, certify that on March 16, 2015, I caused a true copy of the foregoing

*Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion to Dismiss Defendants'*

*Tenth and Eleventh Amended Counterclaims* to be served via ECF and electronic mail upon:

Bennette Deacy Kramer, Esq.
Jeffrey M. Eilender, Esq.
Erik Scott Groothuis, Esq.
Samuel Lucien Butt, Esq.
Schlam Stone & Dolan LLP
26 Broadway
New York, NY 10004
bdk@schlamstone.com
jme@schlamstone.com
egroothuis@schlamstone.com
sbutt@schlamstone.com

Lauren Teigland-Hunt
Teigland-Hunt LLP
127 West 24th Street, 4th Floor
New York, NY 10011
lth@t-hllp.com

*Attorneys for Plaintiffs*

Dated: March 16, 2015
        New York, New York

/s/ I-Heng Hsu
I-Heng Hsu